## Caplan Grocery Co. v. Aron & Co., Inc.

*Contracts—"C. I. F." contracts—Sales—Merchandise—Delivery to carrier —Character of contract not changed by failure to comply with conditions— Action to recover overpayment.*

1. Contracts for the sale of merchandise to be shipped from a foreign port to New York, in which contracts immediately after the specification of the price appear the words "Cost, Insurance and Freight" or the initials "C. I. F.," and in which also appear the words "New York in bond, net shipping weights, telquel" and "Seller's obligation to deliver complete upon presentation of ocean documents" are "C. I. F." contracts.

2. The letters "C. I. F." stand for the words cost, insurance and freight, and mean that the price quoted and agreed upon covers not only the goods at the point of shipment, but their insurance and freight to the point of destination.

3. A "C. I. F." contract is a contract for the sale not of goods, but of documents; all the buyer can call for is a delivery of the customary documents.

4. Delivery of goods to the carrier upon such contracts is delivery to the purchaser, and his title is not affected by an agreement which merely fixes the time and place of payment. Title vests at the time of delivery of the goods to the carrier.

5. The legal character of a contract is not changed by mere failure to comply with some of its provisions.

6. The purchaser of merchandise on "C. I. F." contracts does not have a cause of action to recover an alleged overpayment due to shortage in quantity or unmerchantable character of the goods.

*Practice, C. P.—Pleading—Trade custom or practice—Judicial notice.*

7. The court cannot take judicial notice of a trade custom or practice which has not been pleaded.

Foreign attachment in *assumpsit.* Affidavit of defence raising questions of law. C. P. Allegheny Co., Jan. T., 1921, No. 78.

Before Rowand and Carpenter, JJ.

*A. Seder* and *J. M. Redden,* for plaintiffs.

*Reed, Smith, Shaw & Beal,* for defendants.

CARPENTER, J., Feb. 12, 1925.—Under date Oct. 7, 1920, plaintiff caused a writ of foreign attachment to issue against defendant, and subsequently, by agreement of counsel, a bond in the sum of $5000 was filed and the attachment dissolved. Plaintiff filed an affidavit of cause of action, to which defendant filed an affidavit of defence raising questions of law. An amended affidavit was filed by plaintiff and a second affidavit of defence raising questions of law was filed. The cause came before the court *in banc* Sept. 8, 1924, and was submitted on briefs, in which the facts and questions of law are fully and fairly set forth. Clerical errors to which the attention of counsel was called were later corrected.

The amended affidavit of cause of action (plaintiff's "statement of claim") has attached thereto copies of four contracts, marked "A," "G," "H" and "K," dated, respectively, May 3, 7 and 8 and June 4, 1920. The subject-matter of contracts "A" and "K" is "Bohemian Sugar Tablets;" of "G" and "H" "Java White Sugar," all to be shipped from foreign ports to New York. Plaintiff alleges shortage in quantity in all deliveries and unmerchantable quality of forty-two cases of tablets purchased May 3rd—"A"— and avers that in ignorance of the facts, of which the foregoing is a summary, it overpaid the defendant $3749.03, giving an itemized statement of the alleged overpayments.

Defendant's counsel contend that the statement of claim does not set forth a cause of action. Two questions are raised, the first relating to the con-

tracts, the second to the legal consequences of certain facts pleaded. The contracts are in writing and the subsequent facts pleaded, saving only the alleged defective quality of sugar tablets ("A"), apply alike to all. It is not claimed that anything agreed upon by the parties was omitted from the written contracts; no misunderstanding is alleged.

It is contended by counsel for plaintiff that the several contracts are, and by counsel for the defendant that they are not, what is known in the commercial world as C. I. F. contracts. As the character of the contracts is, or may be, the pivotal point in the controversy, it is of first importance that the essential elements of such a contract, and the status of the contracts here involved, be clearly stated and determined.

Professor Williston (Williston on Sales (2nd ed.), vol. 1, page 605) says: "The initials (C. I. F.) stand for the words cost, insurance and freight, and mean that the price quoted and agreed upon covers not only the cost of the goods at the point of shipment, but their insurance and freight to the point of destination. That is, the seller undertakes to ship the goods, pay the freight and take out insurance upon them in return for a lump price."

They have been in use in England for more than fifty years and are familiar in New York and other maritime states having ports of entry.

In Smith Co., Ltd., v. Marano, 267 Pa. 107, Mr. Chief Justice Brown says: "The letters C. I. F. are abbreviations of the words cost, insurance and freight, and, when used in connection with commercial quotations, signify that the price to be paid for goods will include all charges to the port of destination: 11 Corpus Juris, 765."

Counsel agree as to what the letters indicate, but counsel for plaintiff contends that in the instant case, in the light of all the facts, they do not necessarily make the contracts involved C. I. F. contracts.

Counsel also agree that a C. I. F. contract is a contract for the sale, not of goods, but of documents. On this point there is no room for dispute. In Manbre Saccharine Co., Ltd., v. Corn Products Co., Ltd., 1 K. B. 202 (1919), McCardie, J., says: "All that the buyer can call for is a delivery of the customary documents. This represents the measure of the buyer's right and the extent of the vendor's duty. The buyer cannot refuse the documents and ask for actual goods, nor can the vendor withhold the documents and tender the goods they represent."

The opinion cites a number of authorities and will be referred to later on another point suggested in defendant's brief.

An interesting article on the subject of C. I. F. contracts is published in 32 Yale Law Journal, 711.

If a contract, when made, is a C. I. F. contract, failure of either party to comply with some of its provisions will not affect its status—it remains what it was when made. Whether subsequent events affect the rights and liabilities of the parties is a different question.

Plaintiff does not allege failure to insure, but failure to deliver or tender "ocean documents" which include insurance. Waiving, for the present, discussion of the effect of the provisions in the contracts which call for payment "net cash in New York . . . on presentation of delivery order or ocean documents," we come to the question: Did payment of the bills on receipt of delivery orders and invoices operate as a waiver of any rights or supposed right to insist upon the delivery of "ocean documents?" We are not now dealing with the question of purchaser's rights where he is required to pay for goods before he has an opportunity to inspect them, but with the question

Caplan Grocery Co. *v.* Aron & Co., Inc.

of the rights of the purchaser under the contracts pleaded, who, through its authorized agent, paid, on presentation of "delivery order" and invoices, without demanding "ocean documents."

Taking up at this point the correspondence and contracts, copies of which are made part of plaintiff's statement, we find that, under date June 2, 1920, defendant wrote plaintiff, saying: "We are pleased to advise you that the Bohemian Sugar Tablets which you have purchased from us have arrived in New York and we to-day tendered the Seaboard National Bank our delivery order for 485 cases, together with our draft for $13,178.38, which included duty, weighing and shipping expenses. As the bank had not received instructions from you authorizing them to pay these items, we are obliged to issue our guarantee for the overdraft of $298.88, being the difference between the amount of your letter of credit and invoice. Kindly advise the bank that our invoice is in order so that we may release our guarantee, to which matter we would thank you to give your prompt attention."

The remainder of the letter refers to matters not here involved. Pursuant to instructions given by plaintiff, the sugar tablets were shipped to Haworth & Dewhurst for account plaintiff. Under date July 12, 1920, plaintiff wrote defendant, saying:

"According to certified weight sheet forwarded to us on 479 cases tablets sugar, shipped to Haworth & Dewhurst for our account the net weight was 50,614 pounds.

"We enclose our invoice for 2848 pounds short and request your voucher to cover immediately, as this was a cash outlay on our part."

Under date Aug. 12, 1920, plaintiff again wrote defendant as follows: "On July 12th we billed you for 2848 pounds Tablets Sugar, short on your invoice of June 2nd, you having billed us for a weight of 53,462 pounds, whereas the certified weight sheet showed 50,164 pounds. If you will refer to your file on this transaction you will note that this car was shipped to Messrs. Haworth & Dewhurst of this city for our account. On unloading this car Messrs. Haworth & Dewhurst send us a weight sheet showing only 44,163 pounds received by them in the car. According to this, 9299 pounds were short delivered. This represents a considerable amount over what we billed you on July 12th, and we would like to have you take up this adjustment immediately, as Messrs. Haworth & Dewhurst are claiming a very large refund from us. Please let us hear from you immediately, so that we may have a definite reply for Messrs. Haworth & Dewhurst."

Contracts "G" and "H" were for the purchase of Java White Sugar. It is alleged there was a shortage in weight, the delivery order and invoice calling for 168,000 pounds, the actual weight being 161,912 pounds; that plaintiff overpaid defendant $1385.62.

Under date Aug. 10, 1920, plaintiff wrote defendant, saying: "We enclose our invoice for $1385.63 for adjustment on your invoice of July 7th for 750 bags Java sugar. You billed us with a weight of 168,000 pounds, whereas the certified weight sheet shows a gross weight of 163,928 pounds and a net weight of 161,912 pounds. We are billing you for the shortage, 6088, for which we trust to have your check to cover promptly."

To this letter defendant replied Sept. 25, 1920, as follows: "We are pleased to enclose herewith our check for $615.43 covering overpayment on Java Sugars, ex the S/S 'Waukau,' as per our statement attached."

The phrase "Ex the S/S" referred to the fact that defendant had caused delivery to be made to plaintiff from a ship that had arrived at the port of delivery.

It is not alleged in the pleadings that any notice was given that forty-two cases of 2443 pounds of sugar were worthless, unmerchantable and not reasonably fit for use, for which plaintiff had paid $1.36 per hundredweight.

We have quoted at some length the correspondence attached to and made part of the statement of claim because of the conflicting opinions of counsel respecting the effect of acts of the parties subsequent to the arrival of the sugars in New York, set forth in the statement.

Recurring to the written contracts, we find in all, except "K," immediately following the price specified, the words "cost, insurance and freight" (in "K" the abbreviation "C. I. F." is used), and in all the words "New York in bond, net shipping weights, telquel." All the contracts call for payment in New York, and it follows that the "net shipping weights" which determined the amounts to be paid were not "net shipping weights" in Pittsburgh.

In reference to the term "telquel," we qote from Webster's New International Dictionary (1917) : "Tel quel (tel kel), . . . a clause inserted in certain contracts in foreign commerce which are made to hold good in any case, each party to bear any loss that may accrue to him." The Standard Dictionary says telquel rate is "an absolutely comprehensive or net rate covering all possible charges." The term seems to have been incorporated in the contracts under consideration to foreclose future discussion.

The legal status of the several contracts involved is scarcely disputable; they are, in our opinion, C. I. F. contracts.

Assuming, as we must, that all the material facts averred in the statement of claim are true, and assuming that the contracts are what are known as C. I. F. contracts, and without giving any effect to the words "delivery order," does the admitted failure of defendant to deliver or tender a policy of insurance furnish a basis for this action? It is suggested by defendant's counsel that "ordinarily the importer holds a single bill of lading and a single policy of insurance for an entire cargo of which individual purchasers receive only a part," and from this premise they draw the obvious conclusion that the seller cannot deliver his single bill of lading and insurance policy to every purchaser. But the court cannot take judicial notice of a custom or practice such as suggested; it is not pleaded.

In the Manbre Saccharine Co., Ltd., v. Corn Products Co., Ltd., 1 K. B. 205 (1919), McCardie, J., says: "Even if the defendants had tendered the policies actually held by them, I should still have held the tender bad, for they were policies which covered a quantity of orders outside those mentioned in the bills of lading and invoices sent to plaintiffs. In my opinion, a purchaser under a C. I. F. contract is entitled to demand, as a matter of law, a policy of insurance which covers, and covers only, the goods mentioned in the bills of lading and invoices. This, I think, is settled by the decision of the Court of Appeals, consisting of Lord Cairns, Coleridge, C. J., and Mellish, L. J., in the case of Hickox v. Adams. Unless the purchaser gets a policy limited to his own interests, he would become one only of those who are interested in the insurance; and he is entitled, in my view, to refuse a position which may give rise to obvious complications. See, per Turner, in Ralli v. Universal Marine Insurance Co."

· If the plaintiff had refused to accept the sugars without delivery to him of policies of insurance, he could not have been compelled to pay.

If, as counsel agree, a C. I. F. contract is a contract for the sale of "documents" and not of "goods," it follows that a tender of the documents is sufficient, though it be known that the goods are at the bottom of the sea: 1 K. B. 205, above cited. This suggests the question: When did the title vest in the

Caplan Grocery Co. *v.* Aron & Co., Inc.

purchaser? The shipments were to be made from "Europe, Java or India" and from "Source" (see contracts), and the price agreed upon was per pound or per hundred pounds, "net shipping weights." These and other provisions of the contracts leave no room to doubt *(a)* that title vested in the vendee when the merchandise was weighed and delivered to the carrier, and *(b)* that "net shipping weights" means the weights at the port of shipment. Counsel for plaintiff cite Willets *v.* Abekobei & Co., 189 N. Y. Supp. 525, as supporting their contention that the contracts call for delivery in New York, and that the weight there must accord with the terms of the contract, and, therefore, the contracts are not C. I. F. contracts. We cannot adopt this view. "Net landed weight" does not mean "net shipping weight." Delivery to a common carrier is delivery to the purchaser and his title is not affected by an agreement which merely fixes the time and place of payment.

In Smith Co., Ltd., *v.* Marano, 267 Pa. 107, the Chief Justice says that the court is called upon for the first time to construe a "C. I. F." contract for the purchase of goods "and to determine when, under such contract, there is a delivery to the buyer," and cites cases showing that the English courts hold that property purchased under such a contract passes to the buyer upon delivery to the carrier.

Counsel for plaintiff contend that failure to tender ocean documents (which, it is admitted, include marine insurance) takes the contracts in suit out of the class known as "C. I. F." contracts; converts them into f. o. b. contracts. We adhere to the view heretofore expressed. The legal character of a contract is not changed by mere failure to comply with some of its provisions.

It is alleged that defendant failed to tender a policy of insurance and that plaintiff suffered loss, but it is not alleged that the goods were not insured or that failure to "tender" the policy of insurance caused the loss complained of. If, in fact, defendant did not insure the goods for plaintiff's benefit and, as a result of such failure, he, plaintiff, suffered loss, a different question might arise. In such a case it would be necessary to adapt the pleadings to the facts; show what the customary marine policy covers or, specifically, what losses were insured against.

There is no averment that the weights at which the goods were billed to plaintiff were not the "net shipping weights" at either the port of departure or the port of destination.

Paragraph 10 of the affidavit of cause of action (statement of claim) avers that on June 3, 1920, plaintiff, in ignorance of the matters recited in paragraph 9, sent a telegram, "Exhibit D," to defendant, and that plaintiff's bank thereafter instructed defendant to ship the sugar referred to as instructed in the telegram, and that "defendant received and undertook to comply with said instructions." In paragraph 11 plaintiff says: "Defendant thereupon, by its agent in that behalf, received from said Seaboard National Bank a delivery order for 485 cases of sugar which it had previously delivered to said bank, and purporting to ship all of said sugar, shipped a carload of sugar, as directed by said telegram, as set forth at 'Exhibit D,' but the defendant did not ship in said car 485 cases or 53,462 pounds of sugar, but shipped only 479 cases or 44,387 pounds, of said 479 cases forty-two cases or 2443 pounds were worthless," etc.

The contracts on which this action is founded are in writing and do not call for delivery of the commodities in Pittsburgh.

The request or direction to forward to a designated consignee for plaintiff's account and the alleged default of defendant did not affect the contracts pleaded.

Caplan Grocery Co. v. Aron & Co., Inc.

We have not overlooked the words "Seller's obligation to deliver complete upon presentation of ocean documents." Payment was to be made on "presentation of delivery order or ocean documents." Presentation of either made presentation of the other unnecessary.

In our opinion, plaintiff's conclusions predicated of the facts pleaded are unwarranted; the statement of claim fails to disclose a cause of action.

### Order.

And now, Feb. 12, 1925, the court being of opinion that on the questions raised the law is with the defendant, plaintiff is allowed fifteen days in which to file an amended statement; in default of which, judgment will, on motion, be entered for defendant.

From William J. Aiken, Pittsburgh, Pa.